**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 13 |
| | ) | |
| Michael Angelo Montemayor, | ) | Case No. 25 B 13542 |
| | ) | |
| Debtor. | ) | Hon. Michael B. Slade |
| | ) | |

**MEMORANDUM OPINION DENYING CONFIRMATION OF THE PROPOSED PLAN
AND DENYING THE TRUSTEE'S MOTION TO DISMISS**

Debtor Michael Montemayor seeks confirmation of a proposed Chapter 13 Plan that would last thirty-six months and pay creditors an estimated twenty-five cents on the dollar over the course of that three-year period.  (*See* Dkt. No.  40)  Under the terms of the proposed Plan, a material amount of what otherwise would be disposable income available to repay Mr. Montemayor's debts would instead be used to make monthly payments on his wife's 2025 Tesla—the family's third car, which she purchased days before Mr. Montemayor's last (unsuccessful) bankruptcy case for around $60,000.  The Trustee raises several objections to confirmation and asks me to dismiss the case instead.  (Dkt. No. 27)

While I agree that Mr. Montemayor is a "below-median" debtor, I do not believe that a luxury car is a reasonably necessary expense.  Thus, the Plan fails the disposable income test and is not confirmable.  Moreover, a plan that pays in full a $60,000 debt for an eve-of-bankruptcy luxury car purchase while offering fractional recoveries to other creditors because the proposed Plan only lasts thirty-six months is not proposed in good faith.  A system that sanctions (and in doing so encourages) that sort of irresponsible behavior by a debtor's spouse is surely not what Congress envisioned.  For these reasons, as described in detail below, confirmation of the proposed Plan is denied.

1

That said, I will not dismiss this Chapter 13 case at this time as the Trustee requests. Instead, I credit Mr. Montemayor's testimony that he is committed to repaying creditors to the extent possible, and I believe that a modestly adjusted Plan would be feasible and confirmable. Sacrifices by Mr. Montemayor's household may need to be part of the solution. The bottom line is that if Mr. Montemayor's household chooses to retain the 2025 Tesla during the plan period and in doing so syphon more than $800 each month otherwise payable to creditors, then Mr. Montemayor's Plan will likely need to increase payments and/or last beyond the minimum term to be confirmable. I will leave it to the Debtor and Trustee to negotiate a fair plan in the first instance with the guidance of this opinion. If the parties cannot agree, I will give the Debtor another shot at confirmation if he proposes an amended plan to address the issue. For now, confirmation of the proposed Plan (Dkt. No. 40) is denied, and the Trustee's Motion to Dismiss (Dkt. No. 27) is also denied—both without prejudice.

I.

Mr. Montemayor is a travelling nurse for Advocate Aurora Health. (3/12 Tr. at 31)[1] He works five days a week, driving around the Chicago suburbs to treat patients who are generally immobile and need home care. (*Id.* at 31–33) He sees five to seven patients per day. (*Id.*) To get the supplies he needs to treat patients, he orders in bulk and packs tubs in a work car, a 2019 Subaru Impreza. (*Id.*) These supplies include sharps such as needles for blood draws and receptacles for medical waste. (*Id.* at 33–35; DX 1) And while visiting patients, Mr. Montemayor is exposed to communicable diseases and whatever might await him in patients' homes—even vermin—which from time to time end up in the Subaru. (3/12 Tr. at 36–40) So for safety reasons, his wife and children don't set foot in the Subaru. (*Id.* at 41, 49)

---

[1]   Transcript citations are from the March 12, 2026 Hearing. *See* Dkt. No. 63. In addition, I admitted the Debtors' Exhibits 1–30, *see* Dkt. No. 62, which are referred to here as DX __ and are available at Dkt. No. 55.

Mr. Montemayor also appears to be a devoted father to his five children, aged eight to nineteen. (*See* Dkt. No. 57) Every weekday he drives his oldest child to the train station to commute to college at the University of Illinois-Chicago. (3/12 Tr. at 27) Mr. Montemayor then drives his other children either to school or to the school bus, all before embarking on his daily medical runs. (*Id.* at 24–31)

Until December 2024, the Montemayor household had two cars—the Subaru used for Mr. Montemayor's job and a 2019 Honda Odyssey that fits the entire family. (*Id.* at 45, 47–49) Mr. Montemayor's wife would first drive the Honda to her job—she's also a nurse, working at a rehabilitation clinic in Morton Grove. (*Id.* at 37) Mr. Montemayor would then, early in the morning, drive the Subaru to his wife's work, swap cars with her, take the Honda to run his errands and fulfill child-transport duties, then return the Honda to his wife's work—swapping cars again—before his work began. (*Id.* at 47–49) This obviously wasn't ideal, but the family made it work. (*Id.* at 85–86) And during that period, the family accrued a large sum of debt, some in Mr. Montemayor's name and some in his wife's. (*Id.* at 86–87)

One day in early December 2024, Mr. Montemayor's wife purchased a 2025 Tesla Model Y for approximately $60,000. (DX 10) At trial, I asked Mr. Montemayor about the economic wisdom of that purchase while the family was in financial distress. Mr. Montemayor testified credibly that his wife asked neither for permission nor forgiveness—she purchased the car irrespective of the financial implications. (3/12 Tr. at 53–57) Then, on December 31, 2024, Mr. Montemayor filed his first bankruptcy case. (*See* Case No. 24-19447, Bankr. N.D. Ill.) It went poorly and was dismissed in July 2025. (*Id.* Dkt. Nos. 30, 39)[2] Following the Trustee's final report, it was closed on September 10, 2025. (*Id.* Dkt. Nos. 42–43)

---

[2] At trial, Mr. Montemayor essentially blamed the lawyer who represented him in his prior case for the dismissal. (3/12 Tr. at 78–82)

3

As Mr. Montemayor's first bankruptcy case was in the process of being dismissed, his wife was in the process of consolidating her debt.  In a transaction that closed in the summer of 2025, Mrs. Montemayor consolidated a series of credit card debts—accumulated through purchases that had benefitted the entire household—through a loan with SoFi.  (3/12 Tr. at 61–66)  Mrs. Montemayor is the sole obligor on that SoFi loan, and she alone makes the payments.  (*Id.*; *see also* DX 18–21)

In addition, the Montemayors are not only health care professionals and parents responsible for five children—they also care for Mrs. Montemayor's father, who lives in the Philippines.  (3/12 Tr. at 57–58)  Before Mrs. Montemayor entered the workforce, Mr. Montemayor sent payments to his father-in-law every month to cover his rent.  (*Id.* at 58–61, 88)  More recently, Mrs. Montemayor's other siblings have begun chipping in more, and Mrs. Montemayor (who has worked the past two years) took over making these assistance payments directly to her father to the tune of approximately $90 per month.  (*Id.* at 88-90; DX 16-17)

II.

This bankruptcy case was filed August 31, 2025—before the first one was even closed.  (*See* Dkt. No. 1)  Mr. Montemayor's petition suggests that Chapter 13 was chosen to protect the material equity in the couple's Morton Grove home (which they own in tenancy by the entirety).  (*See* Dkt. No. 1, Schedule A/B § 1.1)  Mr. Montemayor also has a few payments left on two cars—the Subaru and Honda are otherwise largely paid off.  (*See id.* Schedule D §§ 2.1 and 2.3)  Other than those secured claims, Mr. Montemayor has a modest tax debt (*id.* § 2.2) and nearly $100,000 of credit card debt accrued over time (*id.* §§ 4.1–4.10).  Mrs. Montemayor, who as noted above had consolidated her debts into a single sizable loan a few months earlier, is a joint obligor on the couple's mortgage, but she did not file as a joint debtor.

4

Mr. Montemayor's proposed Chapter 13 Plan would have him making payments to the Trustee for thirty-six months.  The first four payments start at $100/month.  (Dkt. No. 40 § 2.1)[3]  Proposed Plan payments then "step-up" as a loan taken against Mr. Montemayor's 401(k), and the loans on the Subaru and Honda, are paid off.  Specifically, proposed Plan payments step up to $1,056/month in four months, to $1,234 after fifteen months, and then to $1,864/month after thirty-four months.  (*Id.*)

Using the "forward-looking" approach to Chapter 13 directed by *Hamilton v. Lanning*, 560 U.S. 505, 509 (2010), by the 34th month of Mr. Montemayor's proposed Plan, he will be able to pay $1,864 per month to creditors even accounting for the fact that his wife's contributions to the household are diminished by expenses that the Debtor seeks to take as marital adjustments reducing his current monthly income.  But the Debtor's Plan proposes that these $1,864 monthly payments to the Trustee stop at month thirty-six—just two months later.  Given the amount of debt, the Trustee advises that the proposed Plan (if confirmed) would pay "only $22,624.03 of the $87,209.96 [owed on] the general unsecured claims on file."  (Dkt. No. 46, p. 2)  My math aligns; I think this Plan would pay creditors approximately twenty-five cents on the dollar.

The Trustee filed a motion to dismiss.  (Dkt. No. 27)  She maintains that the Debtor is not committing all of his actual disposable income to the Plan.  (*Id.* ¶ 2)  And she opposes confirmation, arguing that the Debtor is an above-median debtor who understated his income by making improper marital adjustments to reduce payments to creditors.  (Dkt. No. 46)  The parties' dispute requires me to parse both the Bankruptcy Code and the required Bankruptcy

---

[3]   The proposed Plan would have the Debtor and his wife continue to make mortgage payments, and the Debtor to pay off the Honda Odyssey and Subaru directly to those secured creditors, outside the Plan.  (Dkt. No. 40 § 3.1)

Forms to unravel complex intricacies of Chapter 13 that have frustrated even Chapter 13's most prominent commentator.[4]  I do so below.

III.

"Chapter 13 of the Bankruptcy Code provides bankruptcy protection to individuals with regular income whose debts fall within statutory limits."  *Lanning*, 560 U.S. at 508 (internal quotations omitted).  Unlike Chapter 7 debtors whose nonexempt assets are liquidated by a Chapter 7 trustee to pay creditors with allowed claims, the Chapter 13 debtor can keep his assets as long as he pays his creditors from future income under a court-approved plan.  The purpose of Chapter 13 relief is to "allow the debtor a fresh start where it is possible to do so without liquidating the debtor's assets . . . , while at the same time ensuring that the debtor devotes all of his or her disposable income during the life of the plan to repaying creditors."  *Germeraad v. Powers*, 826 F.3d 962, 971 (7th Cir. 2016).

The language Congress gave us in Chapter 13 provides imperfect tools to address the challenges in ensuring that the "debtor devotes all of his disposable income" to paying creditors during the relevant plan period when only one half of a married couple has filed for bankruptcy.  Even couples that try to keep their finances separate don't fully succeed—that's impossible, particularly when large families are involved.  Here we have a family of seven: two nurses who share responsibility for supporting the household and five children aged eight to nineteen.  Mr. Montemayor has more than seven years of continuous employment with a well-known health system, and his wife joined the workforce two years ago.  Each accrued "their own" debts over time (in the sense that each is not legally obligated to pay some of the other's debts), but cash is fungible and the couple has clearly made choices over time (and will make choices throughout

---

[4]  *See* Keith M. Lundin, LUNDIN ON CHAPTER 13 § 36.20 ¶¶ 16, 53, and § 92.3 ¶¶ 90–91 (expressing various frustrations with the confusing nature of relevant Code provisions and required Forms governing this inquiry).

the plan period) in deciding how to manage debt while covering shared household expenses. Choosing which debts to pay and in what amount has an impact on whose money is available, for example, to buy groceries for the family. Bottom line: it's complicated.

Under the Bankruptcy Code, we start by calculating Mr. Montemayor's "current monthly income" ("CMI"), which the statute defines as:

> (A) the average monthly income **from all sources that the debtor receives** (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on— (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and (B) (i) **includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), <u>on a regular basis for the household expenses of the debtor or the debtor's dependents</u> (and in a joint case the debtor's spouse if not otherwise a dependent)**; and (ii) excludes— (I) benefits received under the Social Security Act ( 42 U.S.C. 301 et seq.); (II) payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes; (III) payments to victims of international terrorism or domestic terrorism, as those terms are defined in section 2331 of title 18 , on account of their status as victims of such terrorism; and (IV) any monthly compensation, pension, pay, annuity, or allowance paid under title 10, 37, or 38 in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services, except that any retired pay excluded under this subclause shall include retired pay paid under chapter 61 of title 10 only to the extent that such retired pay exceeds the amount of retired pay to which the debtor would otherwise be entitled if retired under any provision of title 10 other than chapter 61 of that title.

11 U.S.C. § 101(10A) (emphasis added). To perform this calculation, debtors use Bankruptcy Form 122C-1; they must use "Official Forms prescribed by the Judicial Conference of the United States," *see* Fed. R. Bank. P. 9009(a), and Chapter 13 debtor must complete and file Form 122C-1, *see* Fed. R. Bankr. P. 1007(b)(6). The results inform the commitment period for a Chapter 13 plan and the disposable income test under 11 U.S.C. § 1325(b).

7

Section 101(10A)'s definition of CMI is, by its plain terms, historical—it measures components of income during the six months before the petition was filed. And Part 1 of Form 122C-1 is where the Chapter 13 debtor calculates "average monthly income." It instructs that a married debtor must fill out both column A (debtor) and column B (spouse), for Lines 2 through 11. This means income information must be provided for the debtor and the debtor's spouse even where (as here) the spouse is not a debtor. And the numbers that go in Part 1 of Form 122C-1 are, for each, "the average monthly income that you receive from all sources, derived during the full six months before you file this bankruptcy case." Thus, CMI calculated per Form 122C-1 uses an average of income during the six months before the month the petition is filed and includes income "received" and "derived" by each member of a married couple during that period.[5]

Line 11 of Form 122C-1 instructs married debtors to add both spouses' incomes together. This creates a need for the "marital adjustment" at Lines 13 and 19. As the Trustee avers, the marital adjustment exists nowhere in Sections 101(10A), 1325(b) or anywhere else in the Bankruptcy Code relevant to the calculation of CMI. It is instead a construct intended to correct for mistakes caused by including *all* of a spouse's income in the CMI of every married debtor. Doing that would be improper because, by the plain terms of the statute, a spouse's income is drawn into the CMI calculation *only* if it is used to pay, on a regular basis, household expenses of the debtor or of a dependent. Thus, married debtors check the third box in Line 13 if any amount

---

[5] We'll get to this in a minute, but it's even more complicated than it sounds. The Supreme Court held in *Lanning* that although in most cases a simple average of the last six months' income will be dispositive, in some it will not, as one-time items that skew the average high or low can, at the bankruptcy judge's discretion, be excluded. 560 U.S. at 514, 520 ("In cases in which a debtor's disposable income during the 6-month lookback period is either substantially lower or higher than the debtor's disposable income during the plan period, the mechanical approach would produce senseless results that we do not think Congress intended."); *see also id.* at 524 ("[W]hen a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation.").

captured by adding the non-filing spouse's income to average monthly income is *not* regularly paid for household expenses of the debtor or a dependent and then list these amounts. After totaling the marital adjustments at Line 13 and subtracting them from average monthly income at Lines 11 and 12, debtors are instructed to enter CMI at Line 14 and annualize it in Line 15.

What this calculation is getting at, of course, is the disposable income test: Chapter 13 debtors must pay all projected disposable income to unsecured creditors for the applicable commitment period, using as an imperfect benchmark "the current monthly income of the debtor and the debtor's spouse *combined*." 11 U.S.C. § 1325(b)(4)(A)(ii) (emphasis added). Projecting disposable income for Section 1325(b) purposes essentially requires a dollar-by-dollar analysis to calculate the CMI that should be available to the debtor, and projecting that is not purely historical—per *Lanning*, it includes "known or virtually certain" changes in income or expenses that may not be reflected in CMI or the statutory formula for calculation of disposable income. Known or virtually certain accessions to income are added to or subtracted from gross income and then averaged to arrive at as accurate a forecast as is reasonably possible. *See, e.g.*, *Marshall v. Blake*, 885 F.3d 1065, 1079 (7th Cir. 2018) ("To arrive at a reasonably accurate estimate, *Lanning* instructs courts to look to historical practice and then make adjustments based on known or virtually certain information regarding the debtor's income or expenses.").

Part 2 of Form 122C-1 instructs debtors regarding how to determine disposable income, first by identifying the median family income applicable to the debtor at Line 16. At Line 17, debtors are instructed to compare annualized CMI to the applicable median family income—that is, to compare the number at Line 15b to the number at Line 16c. If annualized CMI is greater than the applicable median family income, the debtor checks box 17b and is instructed to complete Official Form 122C-2—the calculation of disposable income using the means test

9

incorporated from Section 707(b)(2).  Form 122C-2 uses CMI as a starting point and then goes through specified permissible deductions; because this form deals with above-median debtors, the monthly deductions are calculated by adding up the amounts that are contractually due over the sixty months after the petition date and then that amount is divided by sixty.  But if annualized CMI is less than the applicable median family income, the debtor checks box 17a and is instructed, "Do NOT fill out *Calculation of Your Disposable Income* (Official Form 122C-2)." So the below-median debtor then looks to other forms (typically Schedule I and J), and not Form 122C-2, to formally calculate disposable income payable to creditors on a monthly basis.

Finally, the applicable commitment period is a component of the disposable income test in Section 1325(b)(1)(B). Chapter 13 debtors are divided into two paths depending on whether the current monthly income of the debtor and the debtor's spouse *combined* is greater or less than the applicable median family income.  And Part 3 of Form 122C-1 is where every Chapter 13 debtor calculates the "applicable commitment period" defined in Section 1325(b)(4).  At Line 18, Debtors are instructed to copy their "average monthly income from line 11"—the combined gross income of both spouses.  At Line 19, the Debtor again takes marital adjustments, and the instructions advise that these are the same as in Line 13 for individual filers.  This recalculation of CMI is annualized at Line 20 and then compared to the median family income calculated at Line 16c to determine whether the applicable commitment period is three years or five years. That outcome is signaled in a checkbox in Line 21 and then carried backward to another checkbox at the top of the first page of Form 122C-1.

As described in detail below, I believe that (with one exception) Mr. Montemayor and his counsel filled out the required Official Bankruptcy Forms correctly and consistently with Sections 101(10A) and 1325 of the Bankruptcy Code.  This isn't the end of the story in this case,

10

but I think it important for parties and lawyers to understand how I think about these complex calculations for this and future cases when only one half of a married couple seeks to reorganize his or her debts in Chapter 13.

IV.

The first issue in dispute between the parties is the proposed exclusion of a one-time payout of paid time off ("PTO") that Mr. Montemayor received in the six months before his bankruptcy filing from his projected income on Schedule I. The undisputed evidence is that Mr. Montemayor's college-age son informed him late of an imminent tuition payment owed, without which he would not have been able to attend school; Mr. Montemayor had no other money with which to fund this debt, so he took a payout on PTO owed by his employer as a form of cash advance and used the funds to pay his son's tuition. (3/12 Tr. at 67–70) This was income received by the Debtor in the six-months before the bankruptcy filing, so the Trustee argues it must be included in the calculation of go-forward disposable income as a matter of statute.

While I see the Trustee's point based on the text of Section 1325, the Supreme Court has interpreted the statute differently. *Lanning* involved a similar situation: the debtor there had received a "one-time buyout" from a former employer which, as a matter of math, inflated her average income during the six-month pre-petition period above what she would receive post-petition. 506 U.S. at 511. The Court approved excluding the one-time buyout from the disposable income calculation because forecasting disposable income is a projection, and "[w]hile a projection takes past events into account, adjustments are often made based on other factors that may affect the final outcome." *Id.* at 513. Per *Lanning*, Section 1325 requires a forward-looking approach: where we *know* income received in the six-month pre-petition period won't be repeated, we exclude it from projected disposable income. *Id.* at 520. And that is the

11

case here, where a one-time pre-petition event produced income we have no reason to believe will repeat itself post-petition. The Debtor's exclusion of the PTO payout from his projected income calculation is approved, and the Trustee's objection to it is overruled.

*Lanning*'s exclusion of unusual events occurring during the six-month pre-petition period from the calculation of disposable income makes eminent practical sense. People in financial distress often seek to liquidate assets or advance income to keep themselves afloat. But sometimes those efforts pull sustenance from wells only available once. Assuming that these sorts of reservoirs are ever-flowing springs would doom Chapter 13 plans from the start.

V.

The rest of the parties' disputes relate to the marital adjustments taken by the Debtor when calculating CMI on Form 122C-1. (*See* Dkt. No. 58, PDF p. 5) I agree with most, but not all, of the Debtor's positions.

*First*, the Debtor takes a $630.66 marital adjustment for the SoFi loan payments owed and paid by his wife. The documents introduced into evidence demonstrate that these payments are owed solely by Mrs. Montemayor and are paid solely by Mrs. Montemayor. (DX 18–21) This loan, moreover, was taken out to consolidate credit card debt previously owed solely by Mrs. Montemayor. (DX 21; *see also* 3/12 Tr. at 61) And most importantly, although some of the consolidated debt was originally incurred to cover household expenses, go-forward payments by Mrs. Montemayor have nothing to do with paying go-forward household expenses. The SoFi loan is not a line of credit that can be used to make new purchases; it is a consolidation of debt payments owed on *old* household expenses. In my view, this is a valid marital adjustment. *See, e.g.*, *In re Smith*, No. 24-60108, 2025 WL 2810459, at *3 (Bankr. S.D. Ill. Sept. 30, 2025) (spouse's debt repayment plan is a valid marital adjustment) ("The inquiry is not whether the

12

debt was originally incurred for the benefit of the household, but whether the current monthly payment regularly provides support to the debtor or dependents.").

*Second*, the Debtor takes a $1,374.59 marital adjustment for payroll taxes that reduce his wife's income and, thus, are never actually paid to his wife. The Trustee argued that this sum hadn't been proved up (Dkt. No. 46 at 3), but the evidence at trial was sufficient (*see* DX 24, 29). Item 13 of Form 122C-1 explicitly tells debtors to exclude "payment of the spouse's tax liability" from CMI, and that's exactly what the Debtor did here. Every prior decision I have seen has permitted a spouse's payroll tax payments to be taken as a marital adjustment,[6] and I agree.

*Third*, the Debtor takes a $474.41 marital adjustment for his wife's 401k payments. The Trustee concedes that this sum "appears to agree with documents received by the Trustee" (Dkt. No. 46 at 3), and the evidence at trial (*see* DX 23) confirms as much. These payments are made to save for Mrs. Montemayor's retirement; they don't support Mr. Montemayor or his dependents, and they are not newly minted expenses deliberately incurred on the eve of bankruptcy to remove funds from creditors' reach. The Trustee raises no specific objection to including these payments in the marital adjustments, so they are approved, too.

*Fourth*, the Debtor takes a $87.00 marital adjustment for the monthly payments his wife makes to support her father in the Philippines. Item 13 of Form 122C-1 is also explicit that these sorts of payments should be excluded from CMI as marital adjustments because they are not made to or for the benefit of the Debtor. Even though the Debtor previously made these payments to his father-in-law (before his wife entered the workforce two years pre-petition, *see*

---

[6]    *See, e.g.*, *In re Vollen*, 426 B.R. 359, 374 (Bankr. D. Kan. 2010) ("Mr. Vollen's tax withholdings ($1,265.42) do not enter the household income stream and should therefore be deducted from CMI as a marital adjustment. Because they are withheld by the taxing authorities, they are not regularly devoted to household expense."); *In re Shahan*, 367 B.R. 732, 737 (Bankr. D. Kan. 2007) (same).

3/12 Tr. at 88–90), they are now being made by his wife (*see id.*; *see also* DX 16–17) and they have little to do with the Debtor or his dependents.  These are valid marital adjustments, too.

The only place where my views diverge from the Debtor's relates to the marital adjustment claimed for the 2025 Tesla bought by Mrs. Montemayor on the eve of the Debtor's first bankruptcy filing.  It is true that this car was bought by Mrs. Montemayor, is in her name, and only she is on the hook for payments.  (DX 10–15)  But the relevant question for purpose of the marital adjustment is whether the car was purchased and is used for the benefit of the household.  It clearly was and is.  The Tesla serves the purpose of making Mr. Montemayor's household duties easier because he no longer has to swap cars with his wife multiple times to complete his daily routine and, also, it permits the couple to split up so that he can take three kids and she can take two to their various activities (or vice versa).  In the language of *Smith*, these funds are used to provide transportation "from which the Debtor derives an ongoing benefit."  2025 WL 2810459, at *3.  "The inquiry is . . . whether the current monthly payment regularly provides support to the debtor or dependents," *id.*, and it does—indeed, the car's primary purpose is to permit the Debtor to go about his daily routine without inconvenience.[7] One cannot say that "were the non-filing spouse to cease making the payment, the Debtor's standard of living would be the same."  *Id.*

---

[7]   I respectfully disagree with the courts in *Shahan* and *Sale* to the extent they fully excluded the monthly payments on the non-filing spouse's car as marital adjustments.  *In re Sale*, 397 B.R. 281, 288–89 (Bankr. M.D.N.C. 2007) ("The Vehicle payments are made by the Spouse on debts that are not secured by assets of the estate and that are not claims against the Debtor, so they are not amounts paid on a regular basis for household expenses.  Thus, such payments are deductible on Line 17 as a marital adjustment."); *Shahan,* 367 B.R. at 737. Perhaps the details of the situations before those courts were different than this one.  Also, I do not believe the Debtor's citation to *Ransom v. FIA Card Serv., N.A.*, 562 U.S. 61 (2011) advances his theory of the case here. *Ransom* concerned whether a debtor could take a car-ownership deduction from income even though he owed no car payments and thus had no such expense, and the Supreme Court offered the commonsense answer of "no," which seems quite disconnected from the matters at issue here.

14

So, I would exclude the $812.18 "Wife Separate Capital One Car Loan" from the Debtor's "Marital Adjustment List" because it should instead be characterized as a household expense. By my math, when Form 122C-1 is used with the correct inputs to the CMI calculation, Mr. Montemayor remains a below-median debtor.[8] Still, as will be discussed below, my disagreement with this aspect of the Debtor's CMI calculation has ripple effects on the math in the Debtor's Schedules I and J that drives disposable income payable in a Chapter 13 plan.

The Trustee more broadly asserts that instead of claiming marital adjustments when calculating CMI on Form 122C-1, the Debtor should accept that he is above median and is therefore subject to a five-year commitment period and then account for his spouse's expenses by deducting them when he fills out Form 122C-2 to determine his projected disposable income. But as discussed above, with the exception of the Tesla, these expenses are not household expenses, and thus the Debtor is entitled to claim them as marital adjustments for the purpose of determining CMI.

The Trustee also takes issue with the way the Debtor has calculated marital adjustments on Form 122C-1 for expenses with an anticipated commitment term of fewer than sixty months, such as the SoFi loan that will be paid off thirty-three months after the petition date and the Tesla which will be paid off fifty-two months after the petition date. In his most recent Form 122C-1, the Debtor listed the full monthly payment amount for these marital adjustments ($812.18 for the Tesla and $630.66 for the SoFi loan.) (*See* Dkt. No. 58) The Trustee argued at the hearing that the Debtor should instead take the remaining balance of each debt and divide it by sixty to

---

[8]   Look at Part 3 of Mr. Montemayor's Form 122C-1 (Dkt. No. 58). Removing the Tesla from the list of marital adjustments would remove $812.18 from Line 19a, meaning that Line 19b would now be $13,250.97. Annualizing that number on Line 20b brings us to $159,011.64, which is still less than what the Trustee agrees is the median family income in Illinois for a household the size of the Montemayor household (listed on Line 20c).

15

determine the monthly marital adjustment, reflecting the total amount of income that would be needed to pay the expenses over the life of a maximum-length plan.  (*See* 3/12 Tr. at 146–49)

I disagree with the Trustee's methodology for "pro-rating" marital adjustments for spouses' debts that will be paid off in less than sixty months.  Nowhere does the Code or the applicable forms direct a debtor to do this.  The marital adjustment is taken at Part II, Line 13 of Form 122C-1 and copied again at Part III, Line 19 for a married debtor with a non-filing spouse.  The instructions state to "[f]ill in the amount of the income listed in line 11, Column B, that was NOT regularly paid for the household expenses of you or your dependents, such as payment of the spouse's tax liability or the spouse's support of someone other than you or your dependents."

I assume the Trustee came to her conclusion about the calculation for marital adjustments because this is the way that expense deductions are calculated on the separate Form 122C-2.  But the context of Form 122C-2 is very different than the context of 122C-1.  Debtors are directed to complete Form 122C-2 *only* if they find themselves to be above median after completing Form 122C-1.  This means two important things: (a) their commitment period is already established to be sixty months and (b) the amounts that can be excluded from CMI to determine disposable income are defined as provided in Section 707(b)(2).  It makes sense that any deduction in that scenario is divided by the known applicable commitment period on Form 122C-2.  And in addition to providing other criteria governing what can be deducted, Section 707(b)(2) specifically prescribes this formula to calculate expense deductions for above-median debtors.  But a debtor does not yet know the applicable commitment period when calculating marital adjustments for the purpose of 122C-1 (in fact, the marital adjustment math is a critical step in determining the applicable commitment period.)  And if a debtor is below median after completing 122C-1, they will later calculate projected disposable income in accordance with a

16

different section of the Code—Section 1325(b)(2), not Section 707(b)(2).  Another important distinction is that the expense deductions taken on Form 122C-2 are for household expenses whereas marital adjustments are used to accurately account for spousal income not paid for the household expenses of the Debtor or his dependents.  Because an adjustment accounts for income *not* coming into the household at all, it would distort CMI to artificially lower the monthly payment for a current spousal expense just because that expense may not be present for the full length of a plan.  For example, following the Trustee's math, the marital adjustment for the SoFi loan would be lowered to $346.86.  But in reality, the full $630.66 would be unavailable to use towards household expenses for thirty-three months—92% of the applicable required commitment period if the Debtor is below-median.  Thus, beyond simply being provided on a different form, it does not make sense to apply the instructions of Form 122C-2 to Form 122C-1.

The instructions in Part I of Form 122C-1 direct the Debtor to calculate average monthly income to determine CMI based on the full six-month period before the bankruptcy case was filed.  If a source of income is variable, the Debtor is instructed to add the income for all six months together and divide the total by six.  This includes the spouse's income in Column B.  Though it comes into play in Part II of the form, the marital adjustment is part of this calculation of average monthly income for a married debtor because it attempts to ensure that only the amounts paid by a non-filing spouse on a regular basis towards the household expenses of the debtor or dependents are drawn into CMI following the definition of CMI in Section 101(10A).  Line 13 directly calls back to this calculation of average monthly income by directing debtors to reference "the amount of the income listed in line 11, Column B" (determined based on the six-month average) when calculating the marital adjustment.  Thus, it makes sense to follow the same rules that the form provides to draw in the non-filing spouse's total income in Part I when

determining the amount of the marital adjustment in Part II.  I disagree with the Trustee's

position and find that (except with respect to the Tesla) the Debtor did the math here correctly.

Furthermore, in this case, the Debtor has proposed a step-up plan that accounts for

increases in disposable income during the proposed thirty-six-month plan period including that

caused by his wife paying off her SoFi loan.  (*See* Dkt. No. 40 § 2.1)  So creditors are not

prejudiced by the Debtor taking the full marital adjustment for this expense even though it will

change over the life of the Plan.

The bottom line is that as described above, other than with respect to the Tesla, I reject

the modifications the Trustee requests to the specific martial adjustments claimed, and to the

calculation of those adjustments that, combined, would push Mr. Montemayor above the median.

The Debtor is below median.  But that isn't the end of the inquiry under 11 U.S.C. § 1325.

VI.

The Debtor does not propose to pay all of his unsecured creditors in full.  Thus, for this

Plan to be confirmable, I must find over the Trustee's objection that it provides for all of the

Debtor's "projected disposable income to be received in the applicable commitment period" to

be applied to payments to unsecured creditors.  11 U.S.C. § 1325(b)(1)(B)  For a below-median

debtor, "disposable income" is defined by § 1325(b)(2) as follows:

> (2) For purposes of this subsection, the term "disposable income" **means current monthly income received by the debtor** (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) **less amounts reasonably necessary to be expended**—(A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and (ii) for charitable contributions . . . in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

18

11 U.S.C. § 1325(b)(2) (emphasis added). While the Code outlines specific expense deductions under Sections 1325(b)(3) and 707(b)(2) for above-median debtors to use when calculating projected disposable income, "[b]ecause the means test does not apply to Chapter 13 debtors whose incomes are below the median, those debtors must prove on a case-by-case basis that each claimed expense is reasonably necessary." *Ransom*, 562 U.S. at 71.

"What is 'reasonably necessary' is a question of fact for which the outcome can vary from judge to judge and jurisdiction to jurisdiction. Determining what is 'reasonably necessary' and what is not requires the court to engage in the unenviable task of scrutinizing the debtor's schedule of income and expenditures." *In re Nicola*, 244 B.R. 795, 797 (Bankr. N.D. Ill. 2000) (citations omitted). And "[t]he Code does not provide a bright line rule for below-median debtors' expenses, as it does for above-median debtors." *In re Szafraniec*, No. 21-bk-10216, 2022 WL 1750369, at *4 (Bankr. N.D. Ill. May 27, 2022). Instead, "the court has more discretion to determine disposable income than if [their] income is above the state's median." *In re Rekucki*, No. 20-01803, 2020 WL 6105810, at *3 (Bankr. W.D. Mich. Oct. 15, 2020).

The Debtor completed his most recent amended Schedules I and J in accordance with his most recent amended Form 122C-1. (*See* Dkt. Nos. 57, 58) The same expenses the Debtor provided on Form 122C-1's "Marital Adjustment List" are noted on Line 21 of Schedule J as "Other" expenses and excluded from disposable income. Recall that the marital adjustments are a construct designed to include only a spouse's actual contribution to household expenses in CMI. Because Schedule I once again brings all income received by both the Debtor and the non-filing spouse into the calculation, deducting the Form 122C-1 marital adjustment amounts as expenses on Schedule J seems like the only way to complete the official forms to achieve the outcome provided for by the Code in Section 101(10A). So it appears that the Debtor's counsel

19

filled out these forms correctly based on the information they had at the time they were filed. But my finding that the Tesla is a household expense changes the calculation.

Mr. Montemayor testified credibly regarding how each of the three vehicles owned by the household are used. (3/12 Tr. at 32-53) The Subaru is exclusively used as Mr. Montemayor's work car, the Honda is primarily driven by Mr. Montemayor for family transportation, and the Tesla is primarily driven by his wife. But the household historically didn't have three cars and before the couple acquired the Tesla, they managed—Mrs. Montemayor drove the Honda van to her office and Mr. Montemayor swapped cars with her in the morning so that he could run his daily kid-carpool-duties, before re-swapping cars to start his job.

The evidence presented made it clear to me that the Tesla is used for the benefit of the Debtor and his dependents, properly categorizing it as a household expense rather than a marital adjustment to income. Thus, the Tesla's expense can only be deducted from CMI for the purpose of the disposable income test if I find that it is reasonable and necessary. And there are two issues to consider here. First, is it reasonable and necessary for the Montemayor household to have three cars? And if so, is it reasonable and necessary for *this* to be the third car?

At the hearing, the Trustee raised doubts about the reasonable necessity of a third car. But given the Debtor's testimony, I find it makes sense for the Montemayor household to have three cars given the size of the Debtor's family and the special circumstances of the Debtor's job. (*See* 3/12 Tr. at 139) Generally, "while judges should not allow debtors to continue in a lifestyle that drove them into bankruptcy, courts should not require debtors to alter their lifestyle where there is no obvious indulgence in luxuries." *In re Bolger*, No. 97-bk-14380, 1998 WL 351032, at *4 (Bankr. N.D. Ill. 1998). Other courts have found it reasonable for a Debtor to have a third vehicle when the situation calls for it, as it does here. *See, e.g., In re Foehrkalb*, No. 07-31309,

20

2007 WL 3406915, at *3 (Bankr. S.D. Ill. Nov. 13, 2007) (finding reasonably necessary a third vehicle driven by the debtor's dependent son).

But while conceptually a third car is not an "obvious indulgence" for the Montemayor family, *Bolger*, 1998 WL 351032, at *4, it is not reasonable for the third car in a household where one spouse is restructuring debts in Chapter 13 to be a new model luxury vehicle. The disposable income test "prohibits a debtor from proposing to pay for luxury items . . . at the expense of payments to unsecured creditors." *In re McNichols*, 249 B.R. 160, 168 (Bankr. N.D. Ill. 2000). "Expenses may amount to an obvious indulgence in luxuries when a debtor is enjoying luxuries that are not enjoyed by an average American family." *Nicola*, 244 B.R. at 798. "Courts have regarded expensive cars . . . as luxury goods not reasonably necessary for support." *In re Brooks*, 241 B.R. 184, 186 (Bankr. S.D. Ohio 1999).[9] While it may be reasonable for the Montemayor family to have three cars, a $60,000 new Tesla bought on the eve of bankruptcy is an indulgence beyond reason for a Chapter 13 debtor's household. Thus, I agree with the Trustee that the Debtor has not committed all disposable income to the Plan.

## VII.

I also cannot confirm a Chapter 13 plan unless it "has been proposed in good faith and not by any means forbidden in law." 11 U.S.C. § 1325(a)(3). This "has long been the policing mechanism of the bankruptcy courts." *Matter of Smith*, 848 F.2d 813, 821 (7th Cir. 1988). It compels a totality of the circumstances analysis that reviews, among other things, a debtor's motives in seeking Chapter 13 relief, the circumstances under which debts were incurred, and the dischargeability of such debts. *Id.* The timing in which debts were incurred can also matter. *Id.*

---

[9]   *See also In re Rybicki*, 138 B.R. 225, 229 (Bankr. S.D. Ill. 1992) (camper); *In re Gibson*, 142 B.R. 879, 880 (Bankr. E.D. Mo. 1992) (Cadillac and Corvette); *In re Reyes*, 106 B.R. 155, 157–158 (Bankr. N.D. Ill. 1989) (Chevy Blazer); *In re Rogers*, 65 B.R. 1018, 1020–21 (Bankr. E.D. Mich.1986) (Corvette); *In re Zaleski*, 216 B.R. 425, 432 (Bankr. D. N.D. 1997) (Chevy Blazer).

21

This holistic inquiry considers "whether or not under the circumstances of the case there has been abuse of the provisions, purpose, or spirit of (the Chapter) in the proposal." *In re Terry*, 630 F.2d 634, 635 (8th Cir. 1980) (quoting 9 COLLIER ON BANKRUPTCY ¶ 9.20 at 319 (14th ed. 1978)).  I look to "the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Matter of Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984).  And "[i]n considering whether a plan is filed in good faith, the court asks of the debtor: 'Is he really trying to pay the creditors to the reasonable limit of his ability or is he trying to thwart them?'" *In re Smith*, 286 F.3d 461, 466 (7th Cir. 2002) (quoting *In re Schaitz*, 913 F.2d 452, 453–54 (7th Cir. 1990).

As Judge Squires previously wrote, "[w]hen a debtor seeks Chapter 13 relief, the entire family is affected by the sacrifices and special efforts required by the Code.  This family may not continue its prepetition lifestyle to the detriment of creditors." *In re Trimarchi*, 421 B.R. 914, 923 (Bankr. N.D. Ill. 2010) (internal quotation to *In re Gleason*, 267 B.R. 630, 635 (Bankr. N.D. Iowa 2001) omitted); *see also McNichols,* 249 B.R. at 168 ("[D]ebtors may not maintain their pre-petition lifestyles at the expense of their creditors.")  In addition to failing the disposable income test, the Debtor's proposed Plan runs afoul of these prescriptions.  As described above, calculating the disposable income Mr. Montemayor has available to pay creditors through his Chapter 13 Plan is a complex endeavor largely because he filed alone even though he is married, his wife has substantial debts (some joint and some several), and their ability to provide for a seven-person household is clearly interrelated.  The Debtor attempted to account for this using marital adjustments.  But that mechanism allowed Mr. Montemayor to attempt to divert more than $800 per month from his creditors due to his non-filing spouse's purchase of an expensive luxury car on the eve of his first bankruptcy filing.  Though this marital adjustment was

22

disallowed because of the facts presented in this case, the Plan as proposed demonstrates the

potential for abuse when married spouses file individually.

During argument on March 12, 2026, I asked Debtor's counsel how to deal with this

reality—under his interpretation of the Bankruptcy Code, a non-filing spouse could incur a truly

extraordinary expense on the eve of their spouse's bankruptcy filing and the formal CMI

calculation would exclude that expense from the income otherwise payable to creditors during

the plan period as a marital adjustment.  (3/12 Tr. at 108–110)  After all, if that strategy worked,

what non-filing spouse wouldn't use it?  Cash is fungible and surely a married couple would

prefer using funds to acquire assets for the family (a new car!  new bedroom furniture!) to paying

back old (and otherwise dischargeable) debt.  As I expressed during argument, under the logic

offered by Debtor's counsel, non-filing spouses could acquire new Aston Martins or fifty-five-

foot sailboats on the eve of bankruptcy—because that's how the system would work.  (*Id.*)

Debtor's counsel conceded that it was the good faith requirement that would prevent such a

gambit.  (*Id.* 126–27, 142–44).  I agree.  And even though I have found that the luxury purchase

in this case does not meet the criteria to be excluded from CMI as a marital adjustment, I think

the good faith inquiry remains relevant.

After researching the issue further, I see that not all courts concur with this logic.  In *In re

Welsh*, the Ninth Circuit saw no good faith issue with a debtor retaining and paying in full debts

securing unnecessary luxury items while paying unsecured creditors far less than they are owed,

finding that sort of thinking incompatible with Congress's disposable income calculation.  711

F.3d 1120, 1134 (9th Cir. 2013).  I respectfully disagree with the Ninth Circuit's logic in *Welch*.

Congress created the good faith requirement for a reason—to be the "policing mechanism" to

ensure proposed plans are fair as described by the Seventh Circuit in *Smith*.  A plan compliant

with Section 1325(b)(1)(B) may still fail to comply with Section 1325(a)(3).  No court outside of the Ninth Circuit (to my knowledge) has agreed with *Welch*, and I agree with those courts that have rejected it.[10]

In sum, I agree with Judge Squires that a non-debtor spouse's proposed retention of a luxury item in a case where the debtor proposes to pay his unsecured creditors pennies on the dollar does not make sense and, in some cases, will connote bad faith.  *McNichols*, 249 B.R. at 170 ("The family is a functioning unit, of which the Debtor is an integral and important member, and the totality of the family's income and expenses is appropriately considered in calculating both the disposable income of the Debtor for purposes of § 1325(b)(2) as well as the good faith requirement of § 1325(a)(3).")  Here, the Debtor advised at trial that he hadn't really considered whether his wife should file alongside him (3/12 Tr. at 102–04) and confirmed that the Tesla purchase was an extravagant buy on a whim just before his first bankruptcy filing (*id.* at 56–57). A plan that incorporates payment-in-full of this luxury expense and pays only twenty-five cents on the dollar to general unsecured creditors is not, on the facts here, proposed in good faith.

## VIII.

For the reasons stated here, confirmation of the proposed Plan (Dkt. No. 40) is denied, and the Trustee's motion to dismiss (Dkt. No. 27) is also denied.  I will enter separate orders

---

[10]   *See, e.g.*, *In re Goddard,* 662 B.R. 223, 227–28 (Bankr. E.D.N.C. 2024), *aff'd sub nom. Goddard v. Burnett*, No. 24-CV-368, 2025 WL 4350280 (E.D.N.C. Mar. 13, 2025) ("The retention of § 1325(a)(3) instead signifies an intent to maintain the good faith inquiry separate and distinct from the means test and disposable income inquiry. The confirmation process cannot be purely robotic as the Debtor would like, because the court must still evaluate and determine, pursuant to § 1325(a)(3), whether the Plan has been proposed in good faith."); *In re Broder*, 607 B.R. 774, 778–79 (Bankr. D. Me. 2019) (citing cases) ("This Court, however, shares the view of other courts that §§ 1325(a)(3) and 1325(b) have different purposes and, therefore, a debtor contributing all of his or her disposable income under § 1325(b) may still be found to have proposed his or her plan in bad faith if, when viewed in the context of the facts of a particular case, the retention of a luxury item suggests that the debtor is not making an honest effort to repay his or her creditors.  . . . And merely shifting luxury expenses to a non-filing spouse will not necessarily save a plan under § 1325(a)(3)."); *In re Martellini*, 482 B.R. 537, 544 (Bankr. D.S.C. 2012) ("[T]he Court cannot overlook the fact that Debtor's family will keep two expensive recreational items while less than 30% of his unsecured debt is paid.").

denying confirmation and the Trustee's motion to dismiss.  The parties should meet and confer

promptly on the path forward and should be prepared to discuss it with me at the status

conference scheduled for April 14, 2026, at 10:00 AM.


Signed:   April 7, 2026                By:   _____

                                              MICHAEL B. SLADE
                                   UNITED STATES BANKRUPTCY JUDGE